# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NORTHERN AIR CARGO, et al., | ) |
|  | ) |
| Plaintiffs, | ) |
|  | ) |
| v. | ) |
|  | ) |
| UNITED STATES POSTAL SERVICE, | ) Civil Action No. 10-2076 (EGS) |
|  | ) |
| Defendant, | ) |
|  | ) |
| and | ) |
|  | ) |
| PENINSULA AIRWAYS, INC., | ) |
|  | ) |
| Defendant-Intervenor. | ) |

## MEMORANDUM OPINION

Pending before the Court is a motion for temporary
restraining order and preliminary injunction by Plaintiffs
Northern Air Cargo ("NAC"), Tatonduk Outfitters Ltd d/b/a Everts
Air Cargo ("Everts"), and Lynden Air Cargo LLC ("Lynden")
(collectively, "plaintiffs").  Plaintiffs seek to enjoin
Defendant United States Postal Service (the "Postal Service")
from tendering nonpriority mainline bypass mail to Defendant-
Intervenor Peninsula Airways, Inc. ("PenAir") on five mainline
routes in rural Alaska pursuant to 39 U.S.C. § 5402(g)(5)(C)
("§ 5402(g)(5)(C)").  Specifically, plaintiffs challenge the
Postal Service's purportedly *ultra vires* determination that
PenAir had satisfied the "Prior Service and Capacity Requirement"
of 39 U.S.C. § 5402(g)(1)(A)(iv)(II) ("§ 5402(g)(1)(A)(iv)(II)")

as of December 3, 2010.[1]  Plaintiffs argue that they will suffer

"immediate and irreparable injury in the form of . . .

substantial non-recoverable economic losses" if an immediate

injunction is not granted.  Pls.' Mot. at 1.  Upon consideration

of the motion, the responses and reply thereto, the applicable

law, the arguments of counsel made during the motions hearing

held on December 21, 2010, and for the following reasons, the

Court hereby **DENIES** plaintiffs' motion for temporary restraining

order and preliminary injunction.

## I.   BACKGROUND[2]

This is the second action that plaintiffs have filed related

to the Postal Service's purportedly unlawful tender of

---

[1]    As discussed *infra*, the Prior Service and Capacity
Requirement requires the Postal Service "in selecting carriers of
nonpriority bypass mail . . . [to] adhere to an equitable tender
policy . . . and [to], at a minimum, require that any such
carrier- . . . (iv) have provided scheduled service . . . between
2 points within the State of Alaska for at least 12 consecutive
months with aircraft- . . . (II) over 7,500 pounds payload
capacity before being selected as a carrier of nonpriority bypass
mail at the intra-Alaska mainline service mail rate."  39 U.S.C.
§ 5402(g)(1)(A)(iv)(II).

[2]    An extensive factual and statutory background is set
forth in the Court's September 23, 2010 Memorandum Opinion, which
was issued in Civil Action No. 09-2065.  For purposes of this
Opinion, the Court will assume the parties' familiarity with this
factual and statutory background, and will direct interested
readers to the Court's September 23, 2010 Memorandum Opinion for
additional background.  See *Northern Air Cargo v. United States
Postal Serv.*, No. 09-2065, 2010 U.S. Dist. LEXIS 100757 (D.D.C.
Sept. 23, 2010).  A lengthy discussion of the Intra-Alaska Bypass
Mail System and the Rural Service Improvement Act of 2002 can
also be found in the Court's September 23, 2010 Memorandum
Opinion.  *Id.* at *2-8.

nonpriority mainline bypass mail to PenAir. The first action
came before the Court on November 3, 2009 as a motion for
preliminary injunction (hereinafter, the "2009 Action"). *See*
Civil Action No. 09-2065, Docket No. 5. In the 2009 Action,
plaintiffs challenged the Postal Service's August 7, 2009 and
September 2, 2009 determinations that PenAir was eligible for the
equitable tender of nonpriority mainline bypass mail on five
mainline routes: Anchorage-Dillingham, Anchorage-King Salmon,
Anchorage-Aniak, Anchorage-McGrath, and Anchorage-Unalakleet.
With the consent of the parties, plaintiffs' motion for
preliminary injunction was consolidated with a determination on
the merits pursuant to Federal Rule of Civil Procedure 65(a)(2),
and the parties subsequently filed cross-motions for summary
judgment. *See* Civil Action No. 09-2065, Minute Order dated Nov.
4, 2009.

On September 23, 2010, this Court issued an opinion granting
in part and denying in part the parties' cross-motions for
summary judgment.[3] The Court held, among other things, that the
Postal Service had exceeded its statutory authority in
determining that PenAir was not required to satisfy the Prior
Service and Capacity Requirement of § 5402(g)(1)(A)(iv)(II) in
order to be tendered nonpriority mainline bypass mail pursuant to

---

[3] The Court's September 23, 2010 ruling is currently
being appealed by both plaintiffs and PenAir. *See* USCA Case
Numbers 10-5385 and 10-5402.

3

§ 5402(g)(5)(C). *See Northern Air Cargo*, 2010 U.S. Dist. LEXIS
100757, at *29-32. The Court consequently enjoined the Postal
Service from tendering nonpriority mainline bypass mail to PenAir
until the airline satisfied the Prior Service and Capacity
Requirement of § 5402(g)(1)(A)(iv)(II). *See* Civil Action No. 09-
2065, Order at 2. Accordingly, on September 24, 2010, the Postal
Service ceased tendering nonpriority mainline bypass mail to
PenAir. *See* Postal Service's Opp'n at 6.

On October 12, 2010, PenAir submitted a new application to
the Postal Service once again requesting the equitable tender of
nonpriority mainline bypass mail in the five mainline markets at
issue in this case: Dillingham, King Salmon, Aniak, McGrath, and
Unalakleet. *See* Postal Service's Opp'n at 6-7; Declaration of
Steven Deaton ("Deaton Decl.") ¶ 3. By letter dated October 21,
2010, the Postal Service found that PenAir had satisfied the
Prior Service and Capacity Requirement. *See* Ex. B to Deaton
Decl.; *see also* Deaton Decl. ¶ 4 ("[T]he [Postal Service]
confirmed that PenAir had satisfied the Prior Service and
Capacity Requirement . . . by flying a mainline passenger
aircraft between any two points within the State of Alaska for at
least 12 months . . . ."). The letter also stated, however, that
because "[t]he district court did not address whether PenAir
should receive credit for the past 13 months in which it has been
providing mainline service in Alaska . . . the actual tender of

mail to PenAir may violate the court's injunction." Ex. B to Deaton Decl. Prior to tendering nonpriority mainline bypass mail to PenAir, therefore, the Postal Service explained that it needed clarification from the Court regarding whether its proposed equitable tender would violate the Court's injunction. *See* Ex. B to Deaton Decl. ("[T]he Postal Service will immediately begin tendering mail to PenAir upon the occurrence of either of the following events: (1) the court lifts the injunction; [or] (2) PenAir obtains an appropriate clarification of (or modification to) the injunction, which, in the sole judgment of the Postal Service, makes it clear that tendering mail will not violate the court's injunction.").

On November 17, 2010, the Postal Service filed a "Motion for Order to Clarify Judgment" in the 2009 Action. *See* Civil Action No. 09-2065, Docket No. 38. In its motion, the Postal Service asked the Court to clarify whether it "intended to credit PenAir for the past 13 months during which it has been providing mainline passenger service in Alaska." Civil Action No. 09-2065, Postal Service's Mot. for Clarification at 2. On December 2, 2010, the Court denied the Postal Service's motion. *See* Civil Action No. 09-2065, Minute Order dated Dec. 2, 2010 ("After careful consideration of defendant's motion, the Court concludes that the issue on which defendant seeks clarification - 'whether PenAir should receive credit for the past 13 months during which

it has been providing mainline service to Alaskans,' Def.'s Mot. at 2 – is not properly before the Court. Specifically, the Court finds that the issue presented by defendant would require the Court to entertain new factual and legal issues beyond the scope of the Court's Memorandum Opinion and Order."). Following the Court's issuance of this ruling, the Postal Service concluded that PenAir had satisfied the Prior Service and Capacity Requirement. *See* Deaton Decl. ¶¶ 7-8. Soon thereafter, on December 6, 2010, the Postal Service began tendering nonpriority mainline bypass mail to PenAir on the five requested mainline routes. *See* Deaton Decl. ¶ 7.

On December 8, 2010, plaintiffs filed an emergency motion for an order to show cause why the Postal Service should not be found in contempt in the 2009 Action, arguing that the Postal Service had violated the Court's injunction by resuming tender of nonpriority mainline bypass mail to PenAir. *See* Civil Action No. 09-2065, Docket No. 47. On that same date, plaintiffs also filed the instant action, in which it requested a temporary restraining order and preliminary injunction. The Court held a status hearing in the cases on December 9, 2010, at which time it stayed briefing on plaintiffs' motion for contempt in the 2009 Action, and entered an expedited briefing schedule in the instant case. A hearing was held on plaintiffs' motion on December 21, 2010. Plaintiffs' motion for temporary restraining order and

preliminary injunction is now ripe for determination by the
Court.

## II.  LEGAL STANDARD FOR INTERIM INJUNCTIVE RELIEF

Preliminary injunctive relief is an "extraordinary remedy
never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7,
129 S. Ct. 365, 376 (2008); *Munaf v. Geren*, 553 U.S. 674, 128 S.
Ct. 2207, 2219 (2008) ("A preliminary injunction is an
extraordinary and drastic remedy[.]" (internal quotation marks
omitted)).  In deciding whether to grant a preliminary
injunction, the Court must evaluate whether: "(1) the plaintiff
has a substantial likelihood of success on the merits; (2) the
plaintiff would suffer irreparable injury were an injunction not
granted; (3) an injunction would substantially injure other
interested parties; and (4) the grant of an injunction would
further the public interest." *Ark. Dairy Coop. Ass'n v. United
States Dep't of Agric.*, 573 F.3d 815, 821 (D.C. Cir. 2009)
(citing *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1317-18
(D.C. Cir. 1998)); *see also Hall v. Daschle*, 599 F. Supp. 2d 1, 3
n.2 (D.D.C. 2009) ("The same standard applies to both temporary
restraining orders and to preliminary injunctions.").  The moving
party bears the burden of persuasion and must demonstrate, "by a
clear showing," that the requested relief is warranted.
*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297
(D.C. Cir. 2006).

These four factors have typically been evaluated on a "sliding scale," whereby if the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor. *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009) (citing *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 361 (D.C. Cir. 1999)). While it is unclear whether the "sliding scale" is still controlling in light of the Supreme Court's decision in *Winter*, the Court need not decide this issue because plaintiffs' request for a temporary restraining order and preliminary injunction fails even under the less stringent "sliding scale" analysis of *Davenport*. *See id.* (declining, given the facts of the case, to decide if *Winter* created a "stricter standard" to obtain interim injunctive relief).

## III. ANALYSIS

Plaintiffs argue that all four factors necessary to obtain interim injunctive relief "weigh strongly in favor of Plaintiffs," Pls.' Mot. at 11 n.9, while the Postal Service and PenAir argue that none of the criteria for interim injunctive relief have been met. The Court will begin by addressing plaintiffs' likelihood of success on the merits.

### A. Substantial Likelihood of Success

The merits of this case turn on whether the Postal Service properly determined, on December 3, 2010, that PenAir had

satisfied the Prior Service and Capacity Requirement and was therefore an eligible mainline carrier under § 5402(g)(5)(C).

As a threshold matter, the Court's analysis of the validity of the Postal Service's interpretation of § 5402(g)(5)(C) is governed by *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Under *Chevron*, the Court must first determine "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. Courts "use 'traditional tools of statutory construction' to determine whether Congress has unambiguously expressed its intent," *Serono*, 158 F.3d at 1320, including an examination of the statute's text, structure, purpose, and legislative history. *See Shays v. FEC*, 414 F.3d 76, 105 (D.C. Cir. 2005). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. In making such an assessment, "considerable weight" is generally accorded to "an executive department's construction of a statutory scheme it is entrusted to administer[.]" *Id.*

In this case, both parties rely on a "plain meaning" interpretation of the Prior Service and Capacity Requirement.

9

Specifically, plaintiffs argue that the "plain language of the Prior Service and Capacity Requirement confirms that PenAir is not eligible to receive tender of mainline bypass mail under Section 5402(g)(5)(C)," Pls.' Mot. at 12, while defendants contend that the Postal Service's decision to tender nonpriority mainline bypass mail to PenAir "honors the plain language of the Prior Service and Capacity Requirement." PenAir's Opp'n at 7. For the reasons discussed below, the Court concludes that plaintiffs have failed to demonstrate that they have a substantial likelihood of success on the merits.

The Prior Service and Capacity Requirement states, in relevant part, that:

> The Postal Service, in selecting carriers of nonpriority bypass mail to any point served by more than 1 carrier in the State of Alaska, shall adhere to an equitable tender policy within a qualified group of carriers, in accordance with the regulations of the Postal Service, and shall, at a minimum, require that any such carrier– . . . (iv) have provided scheduled service with at least the number of scheduled noncontract flights each week established under subparagraph (B)(ii) between 2 points within the State of Alaska for at least 12 consecutive months with aircraft– . . . (II) over 7,500 pounds payload capacity before being selected as a carrier of nonpriority bypass mail at the intra-Alaska mainline service mail rate.

39 U.S.C. § 5402(g)(1)(A)(iv)(II). Plaintiffs argue that - contrary to the plain language of § 5402(g)(1)(A)(iv)(II) - the Postal Service impermissibly relied upon the ten months that PenAir was unlawfully carrying nonpriority mainline bypass mail

(i.e., while the 2009 Action was pending) in concluding that PenAir satisfied the Prior Service and Capacity Requirement.[4] Specifically, plaintiffs argue that "[f]or the Prior Service and Capacity Requirement to have any meaning, a carrier must provide the required service *before* being tendered Mainline Bypass Mail." Pls.' Mot. at 14 (emphasis in plaintiffs' motion). Plaintiffs further assert that "[n]othing in the Prior Service and Capacity Requirement permits a carrier to satisfy the requirement while carrying – and being compensated for carrying – Mainline Bypass Mail," and that "[s]uch an interpretation contravenes the plain language of the statute and flies in the face of the unmistakable purpose of the statute; i.e., to ensure that prospective new carriers demonstrate their viability and a sustained commitment to serving the rural Alaskan communities with Large Aircraft for twelve consecutive months *before* being permitted to underwrite their operations with the financially significant Mainline Bypass Mail revenues." Pls.' Mot. at 14 (emphasis in plaintiffs' motion). In sum, because PenAir only operated an aircraft with over 7,500 pounds payload capacity for approximately two months before it began receiving an *ultra vires* tender of nonpriority

---

[4]    It is undisputed that PenAir did not begin operating aircraft with over 7,500 pounds payload capacity until on or about August 22, 2009. It is also undisputed that the Postal Service began tendering nonpriority mainline bypass mail to PenAir on November 9, 2009 and continued to do so until the Court issued its Memorandum Opinion in the 2009 Action on September 23, 2010. *See* Pls.' Mot. at 13.

mainline bypass mail from the Postal Service, plaintiffs argue
that the Postal Service impermissibly determined on December 3,
2010 that PenAir had satisfied the clear and unambiguous language
of the Prior Service and Capacity Requirement.

Defendants, by contrast, argue that the Postal Service's
*ultra vires* tender of nonpriority mainline bypass mail to PenAir
is irrelevant to whether the Postal Service properly determined
that PenAir had satisfied the Prior Service and Capacity
Requirement as of December 3, 2010.  Instead, defendants assert
that "[d]etermining whether the Postal Service has validly
'selected' a carrier for nonpriority mainline bypass mail is [] a
simple exercise in arithmetic: Count backwards 12 months from the
date of selection; if the carrier has flown the requisite number
of scheduled mainline flights during those 12 straight months,
the carrier qualifies and the Postal Service's selection is
valid."  PenAir's Opp'n at 7.  Because PenAir had operated the
requisite number of scheduled mainline flights for approximately
16 consecutive months prior to the Postal Service's December 3,
2010 decision to tender nonpriority mainline bypass mail to
PenAir, PenAir argues that the Postal Service correctly
determined that the airline had satisfied the unambiguous
requirements set forth in § 5402(g)(1)(A)(iv)(II).  *See* PenAir's
Opp'n at 7-8; *see also* Deaton Decl. ¶ 4 ("[T]he [Postal Service]
confirmed that PenAir had satisfied the Prior Service and

12

Capacity Requirement . . . by flying a mainline passenger aircraft between any two points within the state of Alaska for at least 12 months, after reviewing the flight schedules submitted to the Postal Service as well as data provided electronically to the Postal Service by the Official Airline Guide . . . . In reaching that conclusion, the [Postal Service] did not segregate bypass mail-carrying flights and non-bypass mail-carrying flights because the statute, section 5402(g)(1)(A)(iv), merely states that the airline requesting immediate equitable tender of mainline bypass mail must have 'provided scheduled service with at least the number of scheduled noncontract flights each week . . . between 2 points within the State of Alaska for at least 12 consecutive months.'").[5]

_____

[5]    In further support of its plain language interpretation, PenAir asserts that the first clause of § 5402(g)(1)(A) sets forth the factors that the Postal Service must consider "when 'selecting carriers of nonpriority mainline bypass mail' – that is, when making its present decision." PenAir's Opp'n at 9 (quoting 39 U.S.C. § 5402(g)(1)(A)) (emphasis in PenAir's brief).  PenAir explains that § 5402(g)(1)(A)(iv)'s requirement that an airline must have provided the requisite number of flights for at least 12 consecutive months "before being selected as a carrier of nonpriority [mainline] bypass mail," 39 U.S.C. § 5402(g)(1)(A)(iv)(II), is "most naturally read to refer to the Postal Service's present decision: a carrier must have flown for 12 months continuously before the Postal Service selects it to carry bypass mail now."  PenAir's Opp'n at 10 (emphasis in PenAir's brief).  Focusing on the structure of § 5402(g)(1)(A), PenAir argues that "[p]laintiffs' contention that 'selecting' refers to one decision in Section 5402(g)(1)(A) and 'being selected' refers to an entirely different decision – when used in a subclause of the same section – is simply not plausible."  PenAir's Opp'n at 10 (emphasis in PenAir's brief).

Upon careful consideration of the parties' arguments, the Court concludes that plaintiffs have failed to establish that they have a "substantial likelihood" of success on the merits. *Ark. Dairy Coop.*, 573 F.3d at 821. As the Court explained during the motions hearing held on December 21, 2010, each of the parties has raised compelling arguments in support of their respective positions. Because the Court requires additional briefing and further explanation in order to resolve the case on the merits, the Court concludes that "[a]t this point, both sides' likelihood of success on the merits . . . must be rated 'uncertain.'" *Potter v. District of Columbia*, 382 F. Supp. 2d 35, 41 (D.D.C. 2005). With the arguments of the parties in equipoise, the Court finds that plaintiffs have failed to carry their burden on this factor.

**B.    Irreparable Harm**

Next, the Court must determine whether plaintiffs will suffer irreparable harm in the absence of interim injunctive relief. This Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. "[T]he injury must be both certain and great; it must be actual and not theoretical." *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam).

Plaintiffs argue that from November 9, 2009 through September 23, 2010 – the time period during which PenAir was

14

unlawfully tendered nonpriority mainline bypass mail in the
Anchorage-Dillingham, Anchorage-King Salmon, Anchorage-Aniak,
Anchorage-McGrath, and Anchorage-Unalakleet markets – plaintiffs
collectively lost approximately $4 million in revenue as a result
of their decreased market share. *See* Pls.' Mot. at 18-19; *see
also* Declaration of David Karp ("Karp Decl.") ¶ 11 (averring that
NAC lost approximately $1.3 million in revenue from November 9,
2009 through September 23, 2010); Declaration of Judy A. McKenzie
("McKenzie Decl.") ¶ 9 (averring that Lynden lost approximately
$1.5 million in annual revenue from nonpriority bypass mail and
freight after it was forced to exit the Dillingham market on
February 13, 2010); Declaration of Susan Hoshaw ("Hoshaw Decl.")
¶ 10 (averring that Everts lost approximately $1.17 million in
bypass mail revenues and $386,000 in freight revenues from
November 9, 2009 through September 23, 2010). Plaintiffs assert
that "[i]f the Postal Service resumes tendering Mainline Bypass
Mail to PenAir in the five requested markets, Plaintiffs will
suffer losses proportionate to those suffered from November 9,
2009 through September 24, 2010." Pls.' Mot. at 19. Because
they "currently have no mechanism to recover these or future
losses resulting from the Postal Service's *ultra vires* acts[,]"
plaintiffs argue that their injuries "constitute *per se*
irreperable harm." Pls.' Mot. at 19-20 (citing *Express One*

*Int'l, Inc. v. U.S. Postal Serv.*, 814 F. Supp. 87, 91 (D.D.C. 1992)).

In response, defendants argue that "[t]his Court has consistently rejected the argument Plaintiffs advance that non-recoverable economic damages . . . constitute *per se* irreparable harm," Postal Service's Opp'n at 13 (citing cases), and assert that plaintiffs cannot demonstrate irreparable harm "from a slight reduction in market share in the five markets at issue[.]" Postal Service's Opp'n at 11. This Court agrees.

In order to obtain interim injunctive relief, it is not enough for a plaintiff to show that it will suffer some harm in the absence of an injunction; instead, the moving party must demonstrate that its harm will be "great." *Wisc. Gas*, 758 F.2d at 674. This is true even if the moving party will purportedly suffer irrecoverable economic losses. While such a party may be excused from demonstrating that its economic loss "threatens the very existence of the movant's business," *id.*, the plaintiff must nevertheless demonstrate that its business would suffer "great" harm in the absence of interim injunctive relief.[6] Put another

---

[6]     In *Wisconsin Gas*, the Circuit held that "recoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business." 758 F.2d at 674. Because *Wisconsin Gas* only addressed "recoverable monetary loss," some judges on this Court have distinguished recoverable economic loss from irrecoverable economic loss when assessing irreparable harm. *See, e.g., Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 51 (D.D.C. 2008) ("The defendant argues that 'monetary loss is not irreparable harm unless it threatens the

way, "the injury must be more than simply irretrievable; it must also be serious in terms of its effect on the plaintiff." *Gulf Oil Corp. v. Dep't of Energy*, 514 F. Supp. 1019, 1026 (D.D.C. 1981).

In this case, the Court finds that plaintiffs have failed to satisfy this Circuit's stringent standard for irreparable harm based on their failure to offer "'substantiation of severe economic impact.'" PenAir's Opp'n at 17 (quoting *WMATC v. Holiday Tours, Inc.*, 559 F.2d 841, 843 n.3 (D.C. Cir. 1977)). Specifically, plaintiffs failed to demonstrate how their projected revenue losses and diminished market shares on the five remote Alaskan routes at issue in this case will impact the *overall economic health* of each of the plaintiff airlines. While the Court is aware that each plaintiff stands to lose approximately $130,000 per month in anticipated revenue in the absence of an interim injunction, the Court is unable to assess the magnitude of this loss without evidence of each airline's

_____

very existence of the plaintiff's business.' The Court agrees with this proposition as a general matter. But where, as here, the plaintiff in question cannot recover damages from the defendant due to the defendant's sovereign immunity, any loss of income suffered by a plaintiff is irreparable *per se*[.]" (internal citations omitted)). While the Court agrees that irrecoverable financial loss may constitute irreparable injury in some cases, this Court is of the opinion that a party asserting such a loss is not relieved of its obligation to demonstrate that its harm will be "great." If this were not the case, then prospective injunctive relief would often cease to be an "extraordinary remedy" in cases involving government defendants. *Winter*, 129 S. Ct. 376.

projected annual gross revenue.  The Court finds plaintiffs'

failure to put forth evidence on this issue particularly

troubling in light of the fact that this issue was raised in

PenAir's opposition brief,[7] and therefore could have been

addressed by plaintiffs in their reply.[8]  Unaided by sworn

declarations from plaintiffs discussing the overall impact of the

projected losses on plaintiffs' businesses, the Court is unable

to find that the purported harm to be suffered by plaintiffs is

sufficiently great to warrant interim injunctive relief.  *See*

*generally Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004)

---

[7]     *See* PenAir's Opp'n at 17-18 ("The fact that the
Plaintiffs will lose market share on *five* discrete—and very
remote—Alaskan routes says absolutely nothing about how that will
impact the Plaintiffs' economic survival. . . . Nothing in the
Plaintiffs' declarations remotely suggests that PenAir's entry
into these five small markets will precipitate bankruptcy or mass
layoffs. Indeed, the *combined* damages that the Plaintiffs
forecast they will suffer is under $4 million—or roughly $1.3
million on average apiece. While a million dollars is certainly
real money, the Plaintiffs' declarations never suggest how big—or
small—this putative loss would be as a percentage of their annual
gross revenues.").

[8]     Plaintiffs failed to address this issue until their
counsel was specifically questioned about it during oral argument
on December 21, 2010.  In response to the Court's questioning,
plaintiffs' counsel provided a chart to the Court which
purportedly reflects the net income of each of the plaintiffs
during the time period that PenAir was receiving the *ultra vires*
tender of nonpriority mainline bypass mail.  Despite its best
efforts, the Court finds plaintiffs' chart incomprehensible and
therefore unpersuasive.  Moreover, this late-proffered chart,
which provides no information regarding plaintiffs' gross
revenues for the same time period, is simply insufficient to
satisfy plaintiffs' heavy burden of demonstrating irreperable
harm.

("A preliminary injunction is an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997))); *see also, e.g.*, *Coal. for Common Sense in Gov't Procurement v. United States*, 576 F. Supp. 2d 162, 169, 169 n.3 (D.D.C. 2008) (rejecting plaintiff's argument that its members would "suffer irreparable harm because lost profits [were] not likely to be recovered later in [the] litigation in the form of damages due to protections of sovereign immunity" where the plaintiff's purported economic injury was not "sufficiently grave to constitute irreparable harm").[9] Accordingly, plaintiffs have also failed to demonstrate that this factor weighs in favor of their requested relief.

---

[9]    The Court will note that while an airline's projected loss of approximately $1.3 million over 10 months is by no means insignificant, this Court has declined to grant prospective injunctive relief when much larger sums of irrecoverable economic losses were at stake. *See, e.g.*, *Sanofi-Aventis U.S. LLC v. FDA*, No. 10-1255, 2010 U.S. Dist. LEXIS 87583, at *36-39 (D.D.C. Aug. 25, 2010) (finding it unlikely that the plaintiff had "met this Circuit's stringent standard for irreparable harm" where plaintiff stood to lose approximately $2.5 billion in annual domestic sales because the plaintiff had worldwide revenues of $40 billion annually).  In determining whether a party requesting interim injunctive relief has demonstrated irreperable harm, the focus of the Court's inquiry is on the magnitude of harm that will be suffered by the moving party, not the particular amount of economic damages that the plaintiff will suffer.

## C.   Harm to Other Interested Parties

Because the Postal Service has been tendering nonpriority mainline bypass mail to PenAir since December 6, 2010, PenAir would undoubtedly be harmed if the Court entered an interim injunction.  *See* Declaration of Daniel Seybert ("Seybert Decl.") ¶ 20 ("[A]n injunction preventing the Postal Service from continuing to tender [nonpriority mainline bypass] mail to PenAir would result in PenAir losing millions of dollars in revenue. . . . Plaintiffs claim lost revenues totaling about $4 million, split among the three Cargo Carriers (with no single Plaintiff claiming lost revenues of more than $1.5 million in freight and mail).  By contrast, an injunction barring the Postal Service from tendering this nonpriority mainline bypass mail to PenAir would cause PenAir to lose about $4 million in revenues, more than two-and-a-half times the lost revenues any single Plaintiff claims it would lose.").  Whatever revenue losses plaintiffs will lose to PenAir in the absence of an injunction, PenAir will lose to plaintiffs in the presence of one.  The Court therefore concludes that the harm alleged by plaintiffs and the harm faced by PenAir are essentially "'a wash.'"  *Sanofi-Aventis*, 2010 U.S. Dist. LEXIS 87583, at *40 (quoting *Serono*, 158 F.3d at 1326).[10]

---

[10]     While plaintiffs also assert that they will "suffer serious non-economic harm . . . in the form of cancelled flights, withdrawal from the market(s), and terminated employees" in the absence of an injunction, Pls.' Reply at 12, PenAir has represented that in the presence of an injunction it will cease

Accordingly, this factor is neutral in the Court's analysis.

**D. Public Interest**

The last factor the Court must consider is whether the public interest favors entry of a preliminary injunction. Plaintiffs argue that "[t]he public interest is 'best served by having federal agencies comply with the requirements of federal law.'" Pls.' Mot. at 21 (quoting *Patriot, Inc. v. U.S. Dep't of Housing & Urban Dev.*, 963 F. Supp. 1, 6 (D.D.C. 1997)). Arguing that "the Postal Service has exceeded the scope of its statutory authority and has failed to comply with the requirements of federal law," plaintiffs assert that "[t]his fact alone demonstrates that the public interest supports the granting of injunctive relief." Pls.' Mot. at 21 (internal quotation marks omitted). While it is undoubtedly true that the public has an interest in governmental agencies following the law, given the facts of this case, an injunction would serve the public interest only if plaintiffs are likely to succeed on the merits. As discussed above, however, the Court has found that the likelihood of plaintiffs' success is uncertain. *See supra* p. 14.

In light of this uncertainty, the Court is unwilling to conclude that the public interest would be served by enjoining the tender of nonpriority mainline bypass mail to the only

---

to provide mainline passenger service on four of the five lines at issue in this case. These non-economic harms, therefore, appear to be unavoidable regardless of the Court's decision.

mainline passenger carrier on the five mainline routes at issue
in this case: Dillingham, King Salmon, Aniak, McGrath, and
Unalakleet.[11]  While plaintiffs argue that an interim injunction
would not prevent PenAir from continuing to provide mainline
passenger service, Pls.' Reply at 13, PenAir has indicated that
it would likely cease to provide mainline passenger service on
four of the five routes if an interim injunction was entered.  As
a result, Alaskan residents in at least four communities would
likely be left without mainline passenger service.  Based on the
current posture of this case, therefore, the Court concludes that
plaintiffs have failed to establish that the public interest
favors interim injunctive relief.

## IV.  CONCLUSION

For the foregoing reasons, the Court **DENIES** plaintiffs'
motion for a temporary restraining order and preliminary
injunction.  This decision, however, in no way forecloses the
possibility that plaintiffs will be able to establish that the
Postal Service impermissibly determined that PenAir was eligible
for the equitable tender of nonpriority mainline bypass mail on
December 3, 2010.  As this Court has already recognized,
plaintiffs have raised some compelling arguments in support of
their position; upon a more fully developed record, plaintiffs

---

[11]     Plaintiffs only provide cargo service to these five
Alaskan communities.

may well be able to succeed on the merits.  Instead, the Court

holds only that upon the current record, plaintiffs have failed

to demonstrate, "by a clear showing," that they are entitled to

the extraordinary and drastic remedy of interim injunctive

relief.  *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.

Even though plaintiffs have failed to establish that they

meet the stringent criteria for the grant of a temporary

restraining order or preliminary injunction, the Court is

nevertheless sensitive to plaintiffs' claims of irrecoverable

economic injury.  In an effort to minimize any potential losses,

therefore, the parties are directed to propose an expedited

briefing schedule to the Court that will enable the case to be

argued and resolved in April 2011.  An appropriate Order

accompanies this Memorandum Opinion.

**SO ORDERED.**

Signed:   **EMMET G. SULLIVAN**
          **United States District Judge**
          **December 23, 2010**